EDWARD HIDDEN and ALBERT N. EDWARDS, Trustees, v. FLORENCE NOBLE EDWARDS and MARY ELIZABETH EDWARDS, Defendants; and ALBERT N. EDWARDS and EDWARD HIDDEN, as Trustees, and as Executors of Last Will of GEORGE L. EDWARDS, and BEN F. EDWARDS, MRS. F. W. EDWARDS and EDWARD L. EDWARDS, Surviving Partners of A. G. EDWARDS & SONS, and A. G. EDWARDS & SONS BROKERAGE COMPANY, Cross-Defendants; FLORENCE NOBLE EDWARDS and MARY ELIZABETH EDWARDS, Appellants.

Division Two, April 5, 1926.

1. **OWNERSHIP: By Corporation of Partnership: Management: Properties and Profits: Covin.** In 1894 a corporation was organized with a capital of $100,000, which was increased from time to time until it reached $1,000,000, but in 1920 was reduced to $50,000. It was a dealer in stocks and bonds and did a general brokerage business. In 1898 its officers and managers found it would be important and advantageous to have a membership in the New York Stock Exchange, but no corporation could be a member of that body. Thereupon a partnership, composed of three officers of the corporation, was formed, and a membership was taken in the name of one of them, which he held for the benefit of the partnership, and which the partnership held in trust for the benefit of the corporation. The partnership owned no property when organized; no partner paid anything to it, but it thereafter transacted the brokerage business of the corporation, and all the corporation's property and assets were turned over to the partnership. In 1908 and again in 1912 written contracts were entered into by which it was agreed that the corporation would receive all the benefits and sustain all the losses of the partnership, as it had previously done under oral understanding. In time all the stockholders became partners. The partnership made large profits, and divided them by giving checks to the partners, who turned them over to the corporation, which, after paying taxes and other expenses, divided the balance as divi-

dends among its stockholders, in proportion to their stock holdings, and among its assets returned by the corporation for taxation was the membership in the Exchange. *Held*, that, notwithstanding the partnership was in custody of the properties, the corporation was their owner, and the partnership owned none of them; and, therefore, upon the death of a partner, the properties were not for administration and distribution.

2. ———: ———: **Fraud: Concealment: Complaint by Participant.** The rules of the New York Stock Exchange forbidding membership to a corporation, directly or indirectly, and a brokerage corporation having organized its officers and stockholders into a partnership and purchased membership in the name of one of the partners, who held it for the use of the partnership, which in turn held it in trust for the benefit of the corporation, if there were fraud and deceit in the manner in which the membership was obtained and continued, it was the Exchange that was deceived and defrauded, and not the partners who reaped the benefit of the deception, and in consequence neither a partner, nor his heirs or legal representatives after his death, can complain; and where all the properties, including the membership, were owned by the corporation, though placed in the custody of and used by the partnership, which turned over all the profits arising from the brokerage business to the corporation, it was the partnership that was the shell, and not the corporation masquerading as a partnership.

3. ———: ———: **Partnership Accounting.** The terms of the contract between partners fix their relation to each other. Where the terms of a contract between a partnership and a corporation, whose stockholders were the only partners, shows on its face that the partnership had no property, but was formed for the limited purpose of deceiving the New York Exchange and thereby obtaining membership, which a corporation could not obtain, and of using the membership for the benefit of the corporation, and it was so used, and all the partners so understood the arrangement, and all the profits were periodically turned over to the corporation, there is no ground for a partnership accounting between stockholders who were not partners and the executors of a deceased partner, or between such stockholders and the heirs of the partner who has died.

4. ———: ———: **Dissolution of Corporation: Management of Properties.** Even though it be admitted that the officers and directors of a solvent business corporation, without the unanimous consent of all its stockholders, have no power to alienate all its property and discontinue the business for which it was created, still it remains true that the officers can lease all its property, or appoint a manager or agent to transact its business; and where what the corporation

did was, not to transfer the ownership of its properties, but to create a partnership composed of its stockholders and make the partnership its agent to transact its business, and transferred the possession and management of its property to it for that purpose, retaining the business of declaring dividends, keeping charge of and protecting its earnings and paying its taxes, there was no dissolution of the corporation, by operation of law, and the stockholders did not become partners in the property in proportion to their respective shares. To quit doing business will not alone work a *de facto* dissolution of a corporation; if its charter has not expired, if it is not insolvent, if it continues to function, if it protects its property, receives the profits earned by its agent in managing its properties, distributes dividends and pays taxes, there is no *de facto* dissolution, or a dissolution by operation of law.

5. **PARTNERSHIP: Dissolution: Death of Member.** Ordinarily death of a partner operates as a dissolution of a partnership, but otherwise where the contract provides that it shall continue and not be dissolved by the death of a partner; and where the partnership agreements provided that upon the death or withdrawal of any partner, all the interests of such partner, so deceased or withdrawing, should cease and determine, and there should be due him from the firm an amount equal to his proportion of the net assets, which amount should be placed to his credit on the books, and the surviving and remaining partners should continue the business, there was no dissolution of the partnership upon the death of a member.

6. ———: **Death of Member: Debts: Allowance: Jurisdiction: Trustees.** Notwithstanding the partnership was created by the officers of a corporation to act as its agent in managing its properties and in transacting its business, if the partnership agreements provided that the firm should continue upon the death of a member, the probate court had jurisdiction, upon the death of a member, to allow a claim, presented by the surviving partners, for moneys shown by the books to have been advanced to him, his executors appearing and representing the estate; and the surviving partners became trustees of an express trust, and had power to assign the judgments to the corporation, which was the owner of all the properties in the hands of the partnership; and though the executors of decedent's estate were also trustees of the beneficiaries, it cannot be said on the theory that they had acted in a dual capacity, that the judgments were not, for that reason, *res adjudicata*, they not being partners and having in each capacity the same interest in defeating the claims or seeing that they were not unjustly allowed.

7. ———: ———: ———: ———: ———: **Res Adjudicata.** A provision in a partnership contract for settlement with a deceased

Hidden v. Edwards.

partner and a continuation of the firm may be construed as authority to take an accounting between the surviving partners and the executors of a deceased partner, without administration of the partnership estate, where the partnership has no assets; and where the firm's books showed that a partner who has died was indebted to it for moneys advanced, the probate court had jurisdiction of a claim presented by the surviving partners for allowance against his estate, and was not divested of that jurisdiction merely because a good defense could have been presented, but was not. Having jurisdiction, its judgments are as conclusive as those of the circuit court; and it must be presumed, against a collateral attack, in support of a judgment of the probate court, that the court found every fact, within the issues, necessary in order to render it; and the same is true if the attack be direct, provided there was evidence to support the finding.

8. ———: ———: ———: ———: ———: Fraud: Direct Attack: Res Adjudicata. Where plaintiffs in their reply might have attacked judgments of the probate court pleaded by executors as estoppel, but did not, but attacked only the jurisdiction of the court, which did have jurisdiction, those judgments become *res adjudicata*, so far as they affect their rights under the present proceeding; but it is not held that the beneficiaries under the will of the decedent, whose executors appeared in the probate court, may not yet attack them in a direct proceeding for fraud, if they have evidence to warrant it.

Corporations, 14 C. J., Section 1320, p. 865, n. 19 New; 14a C. J., Section 1869, p. 104, n. 53 New; Section 2293, p. 440, n. 44; Section 3730, p. 1117, n. 52 New; Section 3735, p. 1120, n. 8. Courts, 15 C. J., Section 35, p. 735, n. 99; Section 151, p. 834, n. 51; Section 442, p. 1021, n. 82. Judgments, 34 C. J., Section 780, p. 494, n. 82; Section 846, p. 545, n. 15; Section 1286, p. 876, n. 95. Partnership, 30 Cyc., p. 438, n. 80 New; p. 653, n. 84; p. 655, n. 85; p. 682, n. 88 New.

Appeal from St. Louis County Circuit Court.—*Hon. G. A. Wurdeman,* Judge.

AFFIRMED.

*Glendy B. Arnold* for appellants; *Thos. C. Hennings* and *Sam A. Mitchell* of counsel.

(1) Joint ownership in a business admittedly a partnership, the sharing of its profits and losses, and the participation in its management, in the absence of the clearest evidence to the contrary, becomes conclusive evidence of membership in the firm. Torbert v. Jeffrey, 161

Mo. 645. (2) The question of partnership or no partnership is one of law. Ellis v. Brand, 176 Mo. App. 554. (3) The statements of Knight, Grant and other witnesses to the effect that the corporation owned the assets of the firm and that the firm was agent of the corporation are legal conclusions and not evidence. Hendley v. Globe Refinery Co., 106 Mo. App. 20; Curtwright v. Culver, 74 Mo. 179; Ellis v. Brand, 176 Mo. App. 390; Roark v. Pullam, 229 S. W. 235. (4) The statements of Knight and Grant that Ben and Albert Edwards were not members of the firm are legal conclusions and not evidence. Ellis v. Brand, 176 Mo. App. 390; Roark v. Pullam, 229 S. W. 235. (5) The officers and directors of even a solvent private business corporation, without the unanimous consent of its stockholders, have no authority or power to alienate all of its property and to discontinue the business for which it was created. Feld v. Roanoke Inv. Co., 123 Mo. 603; Cummings v. Parker, 250 Mo. 427; Coleman v. Hagey, 252 Mo. 102. (6) The transfer of all of the property of the corporation to the firm, with the power and authority in the firm to deal with said property as partnership property, was the act of its stockholders, and not a corporate act, and its officers making such transfer were the agents of the stockholders. Feld v. Roanoke Inv. Co., 123 Mo. 603; Cummings v. Parker, 250 Mo. 427; Coleman v. Hagey, 252 Mo. 102. (7) The transfer of all of the corporate property to the stockholders composing the firm, and the discontinuance of the business of the corporation for fifteen years, was a distribution of the corporate property among its stockholders, which destroyed the corporate title thereto. 14 C. J. p. 59, secs. 20, 21; Cornell v. Corbin, 64 Cal. 197; In re Rieger, Kapner & Altmark, 157 Fed. 613. (8) The corporation and the stockholders having agreed that the firm should have the legal power in cases of death or withdrawal of a partner and stockholder to treat the assets of the firm as firm property for the purpose of accounting to the legal representatives of a deceased partner or to a withdrawing

partner, the corporation and its stockholders are estopped to assert the invalidity of the contract or that it does not mean what it says. McFarlane v. McFarlane, 278 Mo. 1; 21 C. J. 1236, and Sec. 244, p. 1111; Hodde v. Hann, 283 Mo. 329; DeLashmutt v. Teetor, 261 Mo. 441; Spence v. Renfro, 179 Mo. 421. (9) "Death operates as a dissolution of a partnership; the law has never been otherwise." Exchange Bank v. Tracy, 77 Mo. 599. (10) "The law imperatively requires that when a copartnership is dissolved by death the affairs of the firm shall be settled in administration." Ensworth v. Kerr, 68 Mo. 284; State ex rel. v. Withrow, 141 Mo. 85. (11) The probate court is without jurisdiction of demands by the surviving partners against the estate of a deceased partner until there has been an adjustment and settlement of the deceased partner's interest in the firm by the surviving partners, and its allowance of the demands in this case was a nullity. Leabo v. Renshaw 61 Mo. 292; Ross v. Carson, 32 Mo. App. 148; Gaskill v. Spence, 83 Mo. App. 380; Mulhall v. Cheatham, 1 Mo. App. 476; Easton v. Courtwright, 84 Mo. 27.

*Sam B. Jeffries, Arthur E. Simpson* and *Paul F. Plummer* for respondents.

(1) The question of partnership *vel non* as between the parties is to be determined by their intention. Fuel Co. v. Brady, 202 Mo. App. 551; Hindman v. Secoy, 218 S. W. 418; Mingus v. Bank of Ethel, 136 Mo. App. 413; Brown v. Houchin, 154 Mo. App. 261; Chapin v. Cherry, 243 Mo. 407; Hughes v. Ewing, 162 Mo. 261; McDonald v. Matney, 82 Mo. 365; Freeman v. Bloomfield, 43 Mo. 392; Torbert v. Jeffrey, 161 Mo. 645; Ellis v. Brand, 176 Mo. App. 393. (2) The referee's findings that all of the property in the possession of the firm of A. G. Edwards & Sons was, in fact, owned by A. G. Edwards & Sons Brokerage Co., was supported not only by substantial but by overwhelming evidence,

and such findings should be deferred to by this court. State ex rel. Wabash v. Pub. Serv. Comm., 271 Mo. 155.; New England Loan Co. v. Browne, 177 Mo. 412; Snell v. Harrison, 83 Mo. 651; Parker v. Robert, 16 Mo. 657; Mathias v. O'Neil, 94 Mo. 520; Jamison v. Bagot, 106 Mo. 240. (3) There was no dissolution of A. G. Edwards & Sons Brokerage Co. Jackson v. Hooper, 27 L. R. A. (N. S.) 658; Cuppy v. Ward, 176 N. Y. 233; Canning Co. v. Evans, 163 Mo. App. 564. (4) Estoppel is available only to party who has altered his position in reliance upon the truth of the statement in question. Schilling Brew. Co. v. Schneider, 110 Mo. 83.; McFarland v. McFarland, 278 Mo. 1; DeLashmutt v. Teetor, 261 Mo. 412.; 22 C. J. 1294, sec. 1727; p. 1233, sec. 1645. (5) The provisions in articles of partnership that firm shall not be dissolved upon death of a member is binding upon the partners and on their privies. Exchange Bank v. Tracy, 77 Mo. 599; Edwards v. Thomas, 66 Mo. 468; Hax v. Burnes, 98 Mo. App. 707. (6) No creditors objecting, surviving partners have the right to settle with the executor of the estate of a deceased partner. Bell v. Bank, 188 Mo. App. 383; Werner's Law of Administration (3 Ed.) p. 427; Clay v. Field, 138 U. S. 464; Hoyt v. Sprague, 103 U. S. 613; Bell v. Hepworth, 135 N. Y. 442; Richter v. Poppenhausen, 39 How. 82; Laughlin v. Lorenz, 48 Pa. St. 275; Avery v. Myers, 60 Miss. 367; Hyde v. Easter, 4 Md. Chan. 84; Taylor v. Hutchison, 25 Gratt. 536; Young v. Ray, 193 S. W. 608; Powell v. Hurt, 108 Mo. 507; Buckham & Kibbe v. Singleton, 10 Mo. 405.; Estate of Jarboe v. Jarboe, 227 Mo. 59; Sage v. Woodin, 66 N. Y. 578; Palmer v. Kingsford, 112 N. Y. 337. (7) The judgments of a probate court acting within its jurisdiction are conclusive and binding and not subject to collateral attack. Smith v. Black, 231 Mo. 681; McClure v. Baker, 216 S. W. 1018; Norton v. Reid, 253 Mo. 236; Carter v. Carter, 237 Mo. 624; Desloge v. Tucker, 196 Mo. 587; Cox v. Boyce, 152 Mo. 576.; Macey v. Stark, 116 Mo. 481; Sherwood v. Baker, 105 Mo. 472; Murphy v. DeFrance, 105 Mo. 53.

WHITE, J.—The plaintiffs filed their petition as trustees in charge of property belonging to the defendants, Florence Noble Edwards and Mary Elizabeth Edwards, presented their accounts, duly verified, and prayed the court to accept their resignation as trustees, approve their accounts and appoint their successors.

The defendants, Florence Noble Edwards and Mary Elizabeth Edwards, filed a cross-bill making Albert N. Edwards and Edward Hidden as trustees, and as executors of the last will of George L. Edwards, also Ben F. Edwards, Mrs. F. W. Edwards, and Albert N. Edwards, surviving partners of the firm of A. G. Edwards & Sons, a partnership, also A. G. Edwards & Sons Brokerage Company, a corporation, cross-defendants, thus bringing into the case by the cross-bill the trustees in their capacity as executors, and one of them as a surviving partner; also two other persons and a corporation. The original defendants became cross-plaintiffs and the original plaintiffs became cross-defendants. The cross-bill alleged that the cross-defendants named therein had waived objections to the jurisdiction of the parties, misjoinder and non-joinder of causes of action. The several cross-defendants filed their separate answers to the cross-petition and the case was tried mainly upon the issues thus joined.

George L. Edwards, the husband of Florence Noble Edwards and the father of Mary Elizabeth Edwards, their only living child, died July 11, 1919. His wife and daughter were his beneficiaries under his will. During his life he created a trust and appointed the trustees mentioned, placing certain property in their hands as such.

In 1894 A. G. Edwards & Sons Brokerage Company, a corporation, was organized. It succeeded a partnership of that name which then passed out of existence. A. G. Edwards, who died many years before, was the father of the other Edwardses mentioned in the record. The brokerage company originally was incorporated for $100,000. Its capital stock was increased from time to

time until it reached $1,000,000, but in 1920 it was reduced to $50,000.

In 1898 the officers and managers of the brokerage company found it very important to have a membership in the New York Stock Exchange, but no corporation under the requirements of that body could be a member. In order to accomplish their purpose certain officers of the corporation formed a partnership, called A. G. Edwards & Sons, consisting of George L. Edwards, Harry F. Knight and A. D. Grant. A membership was taken out in the New York Stock Exchange in the name of Harry F. Knight, which he held for the benefit of the partnership, and which the partnership held in trust and for the benefit of the corporation. The amount paid for the membership was $26,000, and in addition a transfer fee of between one and two thousand dollars. This sum was paid, cross-defendants claim, by the corporation, a fact disputed by the cross-plaintiffs.

The membership of this firm was changed from time to time by the retirement of members and the accession of others. In each case a written contract was entered into among the members of the partnership. Until 1908 the corporation was not a party to any of those contracts, and the relation of the partnership to the corporation was not expressed in writing. In 1908 the corporation and the partnership entered into a written contract which stipulated their engagements with each other. At that time the partners were George L. Edwards, Harry F. Knight, J. Herndon Smith, Charles W. Moore, W. Arthur Stickney and Theodore D. Peck. In 1912 another contract was entered into between the partnership and the corporation. The partnership at that time consisted of the same persons as when the first contract was made except that Smith and Moore were no longer members.

During all the time from the organization of the partnership in 1898, until 1920, the business of the corporation was conducted by the partnership. No one was a member of the partnership at any time except stockholders in the corporation. The details and the man-

ner in which it was done will be explained below. From the organization of the corporation until the death of George L. Edwards in June, 1919, he was the ruling influence in both the corporation and the partnership. A great deal of money was made for the stockholders of the corporation, and at the time of his death a large amount of property was in existence which the cross-plaintiffs assert belonged to the partnership and which the cross-defendants claim belonged to the corporation.

In 1903 George L. Edwards made an arrangement with Albert N. Edwards and Edward Hidden, the original plaintiffs in this case, to take charge as trustees of certain property for the benefit of his wife, Florence Noble Edwards. In the following year, 1904, a written declaration was made whereby Edwards and his wife placed certain personal property and real estate in the hands of those trustees for her. They continued as such trustees until they started this proceeding.

In the year 1903 George L. Edwards created a trust in favor of his daughter, Mary Elizabeth Edwards; also a third trust in favor of his son, George Lane Edwards, Jr. In 1918 George Lane Edwards, Jr., was killed in the World War, and the property held in trust for him was by the trustees turned over to themselves to be held for Florence Noble Edwards. The trusteeship of the property of Mary Elizabeth Edwards continued until this proceeding.

Albert N. Edwards and Edward Hidden, trustees, in instituting this proceeding, set forth the trust agreements, with an account of their dealings with the trust property from the time of the creation of the trusts down to the time of filing their petition. This property consisted, among other things, of stock in the A. G. Edwards & Sons Brokerage Company, 740 shares, which they had purchased with trust funds. George L. Edwards at the time of his death also owned 1260 shares of stock in the corporation; all of it was pledged as collateral security for his debts, except 360 shares, which were in the hands of A. N. Edwards and Edward Hidden as executors.

The cross-plaintiffs claim that all the property of the corporation was turned over to the partnership and belonged to the partnership at the time of George L. Edwards's death; that the shares of stock held by the trustees in reality represented the interest of the trustees in the partnership assets, and cross-plaintiffs demand that the trustees account for the interest of their beneficiaries in the partnership estate, which they say was dissolved by the death of George L. Edwards. It is also claimed that the shares of stock held by George L. Edwards at the time of his death represented his interest in the partnership estate and they demand that the executors account for the interest of the deceased in that estate, and ask for the appointment of a referee to settle said accounts in accordance with the law relating to the administration and settlement of partnership estates. The cross-plaintiffs further claim that Ben F. Edwards, Albert N. Edwards and Mrs. F. W. Edwards were partners in the firm, and for that reason they are made parties to the proceeding and the cross-bill demands that they account to the trustees and executors as surviving partners.

The cross-defendants contend that the partnership had no property; that the only value in the funds in the hands of the trustees and the executors, besides specific property, was represented by stock in the corporation; that the corporation owned all the property in possession of the firm. The cross-defendants, Albert N. Edwards, Mrs. F. W. Edwards and Ben F. Edwards, deny that they were ever members of the partnership and therefore are not liable to account. The cross-defendant, the brokerage company, a corporation, asserts the ownership of all the property which the cross-plaintiffs say belongs to the partnership.

The trial court appointed W. W. Henderson, as referee, to hear and try all issues of law and fact arising in the case. The referee took voluminous evidence and on January 8, 1923, filed his report, finding all the issues of law and fact in favor of the trustees and the cross-

defendants, and recommended that the cross-bill be dismissed, and the relief prayed for by the trustees be awarded. The cross-plaintiffs filed their exceptions to the report of the referee, which the trial court on March 13, 1923, overruled, rendering judgment as recommended by the referee. From that judgment the appeal was taken by the cross-plaintiffs.

While a large volume of evidence was taken, a good deal of which relates to issues collateral to the main questions at issue, the points disputed, the appellants say in their brief, are propositions asserted by the cross-plaintiffs: (a) that the partnership owned the assets (claimed by the corporation); (b) that the trustees and executors as such owned an interest in the partnership; (c) that A. N., Ben F. and Mrs. F. W. Edwards were copartners in the firm; (d) that cross-plaintiffs were entitled to a decree for an accounting by the cross-defendants. The cross-plaintiffs contend that they established each of these propositions which the referee and the trial court found against them.

I. It is first important to determine whether the partnership owned any property. If it owned the assets which the corporation claims, the finding of the referee

Ownership.

was wrong and the plaintiffs are entitled to the accounting which they demand. If, on the other hand, the partnership owned no property, then there is nothing to account for in its assets, whether the additional alleged partners are in fact so or not.

The corporation started out, as its name indicates, as a dealer in stocks and bonds and doing a general brokerage business. There was a great advantage in being a member of the New York Stock Exchange. Such membership was considered a very valuable asset, much more than was paid for it, as appears in some of the reports. But under the regulations of that Exchange no corporation could become a member or have any interest, directly or indirectly, in it. The brokerage company must of necessity conceal from the Exchange its inter-

est in the membership which it desired. So the officers of the brokerage company conceived the idea of forming a partnership which would handle the business of the corporation, applied for and received a membership in the New York Stock Exchange. On the face of the contracts, certain officers of the corporation formed the partnership and the membership in the New York Stock Exchange was taken out in the name of one of the partners, and so held from the formation of the partnership forward. All the property and assets of the corporation were turned over to the partnership, and the partnership in fact transacted all the business of the corporation. Several contracts were entered into between the partners as the changes in the membership occurred from time to time, but the exact relation of the partnership and the corporation was expressed for the first time in the contract executed by the corporation and the members of the firm in April, 1908. In that contract it was stipulated:

(a)   That all the property of the firm, whether real, personal or mixed, belonged to the corporation.

(b)   The firm was constituted and appointed the agent of the corporation for the transaction of all the business which the corporation was authorized to transact or engage in.

(c)   All business conducted by the firm should be conducted for the use and benefit of the corporation, which was entitled to all the profits derived from it.

(d)   The corporation should pay the expenses incurred by the firm in the conduct of the business and should indemnify and hold harmless from loss or liability, resulting from the conduct of the business, the firm, its members, officers, agents and employees.

In 1912 the corporation and the firm entered into another contract. In that contract it was recited that the corporation had been engaged in the general brokerage business, not including business upon the exchanges, and had considerable assets in the way of cash and securities, and that it was desired and orally agreed that the cor-

poration should retire from active business. Therefore the parties agreed as follows:

"1. The firm will diligently care for the business and good will so turned over by the corporation to the end that the value of such good will and going business shall, as far as possible, be preserved.

"2. The corporation will assist the firm by advances of cash, stock and securities.

"3. The full compensation to be paid by the firm or received by the corporation for the employment and the good will and assets above mentioned shall be the payments hereinafter provided.

"4. The firm will pay to the corporation five per cent interest upon the average amount of cash advanced to the firm or used for its benefit by the corporation, and an amount to be agreed upon from time to time in respect to advances of stocks or securities for use thereof for the benefit of the firm, and in addition thereto will, at the end of each year, pay to the corporation an amount equal to ninety per cent of the profits of the firm for such year, provided, however, that if the remaining ten per cent of the profits shall be less than $40,000 the amount to be paid to the corporation under this article shall be only an amount equal to the profits above such $40,000, so that the firm shall at all events retain for itself each year such amount of $40,000, and this amount shall be cumulative in case the profits of any year do not amount thereto, and provided, further, that in estimating the profits on the basis of which the compensation to be paid by the firm to the corporation is to be computed there shall not only be deducted all losses and expenses of every nature, including the payments to the corporation of interest for cash and of such agreed compensation for stocks and securities of which the firm has the benefit as aforesaid, but also such reserves as the firm may consider proper to establish and maintain to meet future expenses and contingencies as well as to provide for any and all unliquidated accounts or any other legitimate purpose of the firm's business."

It was provided that the agreement should continue until terminated by operation of law, or by election of one of the parties. Either might terminate it on sixty days' notice. It was provided further, that a change in the membership of the firm, however caused, would not itself terminate the agreement.

The effect of that agreement was that the corporation received all the benefit and sustained any losses which should accrue or be incurred by the partnership. The partnership, out of the profits, were to have exactly $40,000 a year with which it was to pay the salaries and expense of operating the business. It is asserted by the appellants that the partnership paid the *profits* to the partners and that *all* the stockholders were partners. It was important that the New York Stock Exchange should be satisfied, because no corporation was permitted to share in any commissions of the New York Stock Exchange. The firm would make a large amount of profits in the course of a year on the capital and assets advanced to it by the corporation. Therefore, the business of the partnership was transacted in this way: The profits were divided among the members of the firm by giving checks, and those checks were turned over to the corporation. The corporation then paid out such profits in dividends to the shareholders. It is explained in this way by Mr. Knight, witness for the cross-plaintiffs:

"When there were earnings by the firm sufficient to distribute a profit to the members, the firm gave a check to each member in proportion to his interest in the firm. He indorsed that check. That check was then taken and put to the credit of profit and loss on the A. G. Edwards & Sons Brokerage Company's books, and the brokerage company paid a dividend to its stockholders."

And further this witness said:

"I am stating what I know to be the facts about the interest of the brokerage company stockholders and profits in proportion to that interest. Each member of the firm took his check for the profits and turned it over to the corporation. That is the way they handled it.

None but members of the firm could receive any moneys from the firm, and because of that, when the firm earned profits which it wished to transfer to the corporation, the checks for the profits were made to the members of the firm, and those checks were indorsed to the corporation and paid by it to its stockholders as dividends.''

Mr. Alex D. Grant, one of the first partners, explained that matter in this way:

''The settlement was made to the brokerage company. I do not remember that I was paid anything for any interest I had in the partnership. The settlement was made with the brokerage company. I had no personal interest in the firm at that time or any other firm. *Whatever interest I had in the firm was because I was a stockholder in the corporation that owned the whole assets of the firm.* In selling my stock I was relieved of all interest in the corporation and the partnership. I was not paid anything for my interest or any interest I might have had in the stock exchange seats. They were claimed by the brokerage company and I settled with them on that basis.''

This method satisfied the consciences of the members of the firm and the officers of the corporation, and, apparently, satisfied the New York Stock Exchange, if it knew anything about it. The profits of the business were paid in checks to the partners who gratuitously indorsed them to the corporation and the corporation paid out of the profits in dividends to the stockholders, whether they were partners who received checks in the partnership or not.

The appellants argue that this method shows the property belonged to the firm and not to the corporation. There is nothing in the arrangement to justify that conclusion. It was made purely to conceal the real beneficiaries of the business from the New York Stock Exchange. As between themselves, the parties to it knew exactly what they wanted, and understood that the corporation owned the property, were entitled to the profits, which the stockholders received as dividends. In other

313 Mo. 42.

words, the corporation dealt in good faith with its stock-holders and gave them just what they were entitled to as such.

When a member of the partnership withdrew, as members did on several occasions, he was paid the value of his stock. That is, he retired from the firm when he sold his stock in the corporation. As Harry Knight, the witness for the cross-plaintiffs, said, ''I sold my stock on the basis of the ownership of that property being in the corporation, under the contract, the contract under which the firm and brokerage company did business.''

Grant explained his withdrawal from the business in this way: ''In other words, I agreed on the net worth of my interest in the firm and corporation. I sold my stock and retired from the business. I got a check from the brokerage company for the value of my interest. I got my check from the corporation.'' So in every instance when a partner withdrew from the partnership, he sold his stock in the corporation and was paid for that stock what it was estimated to be worth and that was all he was paid.

That the firm owned no property to start with is not denied. No partner paid in anything to the firm. It paid nothing to the corporation for the property which the corporation put in its possession to transact business with.

It is asserted that the membership in the New York Stock Exchange at least belonged to the firm. It was testified to by Grant and not denied that the corporation money paid for the seats in the exchanges. The books of the partnership showed no entry where any of the partnership members paid for anything in the firm assets. One reason for entering the contract of 1912, which changed somewhat the terms upon which the firm operated with the corporation's property, was to more effectually conceal their relation to each other. The officers were afraid that a retiring member would make trouble with them because of the contract between the firm and the corporation. It was not sufficiently explicit as to the

terms on which the firm handled the corporation business.

Another circumstance, indicating how the parties understood the relation of the two, is that the corporation returned all the property for taxation. Some of the tax returns appear in the record accompanied by lists of the property. For the year 1909 the stock outstanding amounted to $1,000,000; the gross income for that year was more than $773,000, and the net income over $131,-000, upon which the corporation paid an income tax. This statement was sworn to by Mr. Knight, witness for the cross-plaintiffs. Among the assets listed in some of the tax returns was the membership in the New York Stock Exchange, valued at $75,000. All this property returned for taxation purposes by the corporation was in the custody of the partnership, A. G. Edwards & Sons. No property was ever returned for State or Federal taxes by the partnership and the partnership paid no taxes. Thus, the officers and stockholders of the corporation and the members of the partnership understood all the time that all the property belonged to the corporation and none of it belonged to the partnership. If any fraud was perpetrated it was upon the New York Stock Exchange, for apparently the corporation effectually concealed from that institution the fact that it was the real party in interest and received all the benefits of the Exchange membership which the partnership held. But that is not a matter of which the cross-plaintiffs have a right to complain. They were not deceived by it. They lost nothing in consequence of it. No member of the firm, no stockholder in the corporation, was deceived at any time about the real facts and the real relation of those parties to each other. The cross-plaintiffs seek to benefit by the *ostensible* condition, by the camouflage employed by the corporation to deceive, not them, but somebody else. If anyone had been deceived to his injury by the scheme employed, using the partnership name and the partnership agency to conceal the real ownership of the assets, such party would have a right to complain. But cross-plaintiffs are not in that position.

The appellants argue that the corporation was a mere shell, a pretense without substance, that all the property belonged to the partnership, which was the real thing. There was no purpose, lawful or otherwise, to be served by keeping up the pretense that the corporation had property, if in fact it had none, and exercised no functions. There was no reason why it should elect directors, keep books, pay taxes and dividends, if there was no substance in its existence.

There *was* a reason why the partnership should put up a front and make pretenses which were not supported by reality. It was necessary in order to keep the membership in the New York Stock Exchange. The corporation put on a false face and masqueraded as a partnership, in order to carry out its purposes. It was a real thing, and the partnership was the shell.

The referee and the trial court were justified in finding that the corporation owned all the property and the partnership owned none.

II. Appellants contend that Mrs. F. W. Edwards, Albert N. Edwards and B. F. Edwards were members of the partnership and therefore were liable to account to the executors of George L. Edwards for the partnership assets. The referee found from the evidence, and the trial court adopted the finding, that they were **Partnership Accounting.** not partners. That seems to be immaterial in view of our holding that there were no partnership assets so as to require an administration or accounting. As between the parties to a partnership contract, their intention must control. If anyone had dealt with the partnership and had become a creditor on the belief that it possessed assets and that A. N. Edwards and the others were partners, a different question would be presented here. But all the parties concerned, those admitted to be members of the partnership and all those whom the appellants claim to be partners, treated the partnership as possessed of no assets, and of the limited membership claimed by respondents. The trustees of the

cross-plaintiffs and George L. Edwards, deceased partner, all understood it in that way.

The terms of the contract between the partners fix the *status* of the parties as to each other. [Chapin v. Cherry, 243 Mo. l. c. 403; Fuel Co. v. Brady, 202 Mo. App. l. c. 557.] All the contracts of the partners signed by them and all their contracts with the brokerage company show the membership and the relation to the corporation as claimed by the respondents. The evidence shows and the referee found that, in whatever respect the conduct of the parties tended to show a different situation, such conduct was for a purpose not indicative of the real situation. So far as there was a purpose to misrepresent the real situation, it was to deceive the New York Stock Exchange, cross-plaintiffs were not deceived by it, nor were their trustees nor George L. Edwards through whom they claim.

III. According to appellants, the corporation ceased to exist and therefore the property of the corporation, by operation of law, vested in the stockholders as partners in proportion to their respective shares. That is the effect of the argument. They state the proposition that the officers and directors of a solvent business corporation, without the unanimous consent of the stockholders, have no power to alienate all of its property and to discontinue the business for which it is created. Very good. Therefore, if the directors, without the consent of *all* the stockholders, could not transfer the *ownership* of the property to the partnership, it was *not* so transferred. What the corporation did was, not to transfer the *ownership* of the property, but to transfer the possession and management of it. The officers of the corporation could lease all the property, could appoint a manager and agent to transact its business. That is not questioned, and that is what was done. The corporation made the partnership its agent, to transact its main business. It retained the business of declaring dividends, keeping charge of and

*Dissolution of Corporation.*

protecting its earnings and paying its taxes. It did not deprive itself of all functions.

Appellants refer to such cases as Cummings v. Parker, 250 Mo. 427; Feld v. Roanoke Inv. Co., 123 Mo. 605, in which the doctrine is stated that a corporation which is a going concern and solvent may not, during its charter life, without the unanimous consent of its stockholders, dispose of its corporate property. It is not pointed out and we are unable to find in the record where it is shown that *all* the stockholders of the corporation consented to an *alienation* of the property or to any arrangement with the partnership. The contracts are executed by the officers.

There is no theory on which the corporation could be said to be dissolved. It still retained possession of earnings. The cessation of active business by a corporation does not imply its dissolution. [Youree v. Ins. Co., 180 Mo. l. c. 164; State National Bank v. Robidoux, 57 Mo. 446; Canning & Packing Co. v. Evans, 163 Mo. App. l. c. 574, 575; Moore v. Whitcomb, 48 Mo. 543:]

In the Youree case the court said, quoting from Thompson on Corporations: "By a dissolution in law is meant a dissolution which may take place either (1) by a judgment of a court of competent jurisdiction; or (2) by a legislative repeal of the charter of the corporation, where the right of repeal has been reserved in the statute granting the charter, or in the Constitution or general law; or (3) by the expiration of the period named in the charter as the period of the duration of the life of the corporation. By a *de facto* dissolution, we mean that dissolution which takes place, in substance and in fact, in the case of corporations organized for pecuniary gain, when the corporation, by reason of insolvency or for other reason, suspends all its operations and goes into liquidation."

If we understand appellants' contention it is that the corporation was dissolved *de facto* on the ground that it quit doing business. That alone does not affect a *de facto* dissolution. It was not insolvent. It did not

go into liquidation. It retained possession of its property, if the intention of the officers and stockholders is to control. It did not "suspend all operations," but continued to function as a holder of property and the payer of dividends and taxes. The finding of the referee that the corporation continued to exist and function and own property which it claimed to own, is supported amply by the evidence. Therefore, there is no ground for saying that the property of the company by operation of law passed to the partnership, composed of its former stockholders.

IV. In 1920 the brokerage company, with the consent of all its stockholders and directors and officers, took back the property, the possession of which had been delivered to the partnership, and this was agreed to by the members of the partnership. In December of that year the corporation reduced its capital stock from $1,000,000 to $50,000. Securities held by the corporation were sold from time to time, liabilities paid, and the holdings of each stockholder reduced by payment to them in cash *pro rata*. The amount thus received by the trustees of Florence Noble Edwards was $34,000. In July, 1920, the partnership of A. G. Edwards & Sons was converted into a limited special partnership and conducted on a different basis from the original partnership. Florence Noble Edwards was a member and signed the partnership contract. It had a paid-up capital of $250,000, of which Florence Noble Edwards contributed the $34,000, received for her capital stock canceled in the corporation. She withdrew from the firm December 31, 1920, and received that amount with the earnings. Thus, in 1920 the corporation and the partnership each changed its character. The corporation reduced its capital and naturally did a smaller business; the partnership had capital of its own and thenceforward it was the intention of the partnership to own the property with which it dealt.

*Proof of Corporate Existence.*

But the fact that all the parties to the partnership and all the stockholders of the corporation consented to this arrangement *showed that the corporation was still in existence, functioning and in possession of its property, and was so for a year before this suit was brought.*

V. Another contention of the appellants may be considered as incidental, although not affecting the result. It is claimed that on George L. Edward's death, as a member of the partnership, the partnership *ipso facto* was dissolved and it became necessary for the partnership estate to be administered upon as the law directs. Ordinarily death operates as a dissolution, but otherwise where the contract of partnership provides that it shall continue and not be dissolved by the death of one partner. [Exchange Bank v. Tracy, 77 Mo. 599; Edwards v. Thomas, 66 Mo. 468; Hax v. Burnes, 98 Mo. App. 707.] The partnership agreements provided that upon the death or withdrawal of any partner, all the interests of such partners, so deceased or withdrawing, shall cease and determine; that there should be due from the firm to the withdrawing or deceased partner an amount equal to his proportion of the net assets in the firm and the surviving and remaining partners should continue in the business. The amount of the interest of the withdrawing or deceased partner should be placed to his credit on the books of the partnership. That agreement was recognized and was not modified in any way by the later agreements of the firm with the corporation.

After the death of George L. Edwards in 1919 it was found that he was indebted to the firm for money which had been advanced him from time to time. Two claims were presented against his estate in the probate court by the surviving partners and allowed, one for $52,156.07, and one for $47,557.80. His executors, Edward Hidden and Albert N. Edwards, represented his estate in that proceeding. The allowance was made in May, 1920. These judgments were immediately assigned by the part-

*Margin notes: Partnership: Dissolution.*

nership to the corporation. The referee in his finding said that the surviving partners, to whom this amount was due, were trustees of an express trust and the allowance was for the benefit of the brokerage company, the real party in interest. This finding was authorized by the contracts between the partnership and the corporation. The referee found that the judgments were not *res adjudicata* against the cross-plaintiffs, because of the dual capacity in which the same individuals served as trustees and executors. We hardly understand the reason for that conclusion. The trustees were trustees for one of the beneficiaries of the estate. They were executors of the estate. They had, in each capacity, the same interest in defeating the claims, or in seeing that they were not allowed unjustly. They were not partners, and received no benefit from the allowance of the claims.

It is true that a partner is at no time a debtor to his firm until it is shown on a settlement of the partnership business. If we disregard the partnership contract, no doubt the estate of George L. Edwards could not be found indebted to his partners until a settlement of the partnership estate. [Gaskill v. Spence, 83 Mo. App. 380.]

The cross-defendants, Edwards and Hidden, set up these judgments in their answer to the cross-bill, alleged that they were not appealed from and are therefore *res adjudicata*. The record does not show that cross-plaintiffs, in reply to the answer, alleged *any* infirmity in those judgments, or referred to them. It is only claimed in the briefs that the probate court was without jurisdiction to allow the claims against the estate of George L. Edwards, because the partnership estate was not settled.

The partnership contracts provided for a settlement with a withdrawing or deceased partner, and that provision might be construed to allow just what was done, to take an accounting between the surviving partners and the deceased's executors without administration, since the partnership had no assets. Whether such a construction could be allowed or not, is not important. The probate court had *jurisdiction* of the claims presented,

and was not divested of that jurisdiction merely because a good defense could have been presented. Its judgments are as conclusive as those of a circuit court. It must be presumed, against collateral attack in support of these judgments, that the probate court found every fact, within the issues, necessary in order to render them. [Crary v. Standard Inv. Co., ante, page 448.] This is true if the attack be direct, provided there was evidence to support the finding. [Smith v. Railroad, 279 Mo. l. c. 187.]

The cross-plaintiffs in their reply might have attacked those judgments *directly*, but did not do so. Their only attack is the collateral one for alleged want of jurisdiction. We think the judgments are *res adjudicata* in this proceeding. We do not say that the beneficiaries of the will of George L. Edwards may not yet attack them in a direct proceeding for fraud, if they have evidence to warrant it. Otherwise, there being no assets, the cross-plaintiffs cannot complain of the failure of the statutory administration of the partnership estate. They have lost nothing by it.

If there is any objection to the accounts presented by the trustees, it does not appear in the record here. We are unable to find where the cross-plaintiffs are not getting the full benefit of all the property of which the trustees have custody and the full benefit of all they are entitled to, out of the estate of George L. Edwards. It was for the trial court, in taking the accounting between the trustees and the cross-plaintiffs, to see that no injustice is done them.

The judgment is affirmed. All concur.